IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,   ) | |
| ) | |
| Plaintiff,   ) | |
| ) | |
| v.   ) | Case No. 18-cr-20025 |
| ) | |
| WILLIAM A. GOODWILL,   ) | |
| ) | |
| Defendant.   ) | |

**OPINION**

**SUE E. MYERSCOUGH, U.S. District Judge:**

Before the Court is Defendant William A. Goodwill's Motion to Suppress (d/e 22). An evidentiary hearing on the motion was held on May 15, 2019. For the reasons set forth below, Defendant's motion is DENIED.

**I. BACKGROUND**

At approximately 1:58 p.m. on May 16, 2018, Macon County Sheriff's Office Detective Jonathan Roseman, accompanied by Detective Hunt, initiated a traffic stop of a white 2008 Ford Edge being operated by Defendant. Detective Roseman stopped the Ford Edge because the vehicle's windows were tinted darker than allowed by Illinois law and the vehicle's tires crossed over onto the shoulder

of an off-ramp.

After initiating the traffic stop, Detective Roseman exited the police vehicle, approached the Ford Edge, introduced himself to Defendant, and requested Defendant's driver's license and insurance information. Shortly thereafter, Defendant, at Detective Roseman's request, exited the Ford Edge and accompanied Detective Roseman to the police vehicle.

While in the police vehicle, Detective Roseman conversed with Defendant. Detective Roseman asked Defendant about the Ford Edge, Defendant's son, and the length of time Defendant planned to be in the Decatur, Illinois, area. Detective Roseman also asked Defendant about the expiration date on the sticker on the Ford Edge. At this point, Detective Roseman had already decided that he would issue Defendant a written warning for the observed traffic violations.

During the conversation, Detective Roseman, in order to complete Defendant's written warning, typed information from Defendant's driver's license into the police vehicle's computer in order to request information from the Illinois Secretary of State and LEADS. Detective Roseman also entered the Ford Edge's license

plate number into the computer to request additional information from the Illinois Secretary of State and LEADS.  Detective Roseman requested this information to verify that Defendant's driver's license was valid, that the information on the license was correct, that the Ford Edge's registration was up-to-date, and that the Ford Edge had not been reported as stolen.  Chimes heard during Detective Roseman's conversation with Defendant, one of which occurred at 2:01 p.m., indicate that information requested by Detective Roseman had been received and could be reviewed on the police vehicle's computer.

     Eventually, Detective Roseman inquired as to the owner of the car.  Defendant stated that the Ford Edge belonged to Tamara, a female friend of his.  At the evidentiary hearing, Detective Roseman testified that his questions about ownership of the Ford Edge came after he had received information from the Illinois Secretary of State showing that the Ford Edge belonged to a male subject.  Given that the Ford Edge was registered to a male subject, Detective Roseman found it strange that Defendant had stated that the vehicle belonged to a female.

     Detective Roseman informed Defendant that Defendant was

receiving a written warning that would not "cost [Defendant] a dime" and that the officers would use a window tint meter on the windows of the Ford Edge. In response to additional questions from Detective Roseman, Defendant stated that he had not received any tickets in the last 12 months and had never been in trouble before. At the time Defendant gave these answers, Detective Roseman had reviewed information sent to the police vehicle's computer indicating that Defendant's criminal history included a conviction for an offense involving a controlled substance. Detective Roseman reiterated that there was no fine or fee associated with the written warning Defendant was receiving. Defendant stated that he had to use the bathroom.

    As the conversation continued, Detective Roseman began writing Defendant's written warning at approximately 2:04 p.m. Information to be included in the written warning included the date; the time; the year, make, and model of the vehicle Defendant was driving; Defendant's name, date of birth, and address; the traffic violations; and the location of the traffic stop. For a window tint violation, Detective Roseman testified that his practice was to also have the driver review the readouts after applying a window tint

meter to each window of the vehicle.

Detective Roseman testified that he does not write information on a written warning as soon as he views the information on the police vehicle's computer. He explained that he waits to see if the vehicle comes back as stolen or if the driver has a warrant out for his arrest before filling out a written warning that can be completed later if need be.

The conversation between Detective Roseman and Defendant eventually turned to Defendant's employment, with Defendant stating that he worked at a warehouse and a strip club. Detective Roseman again stated that there would be no fee or fine associated with the written warning. Detective Roseman also verified Defendant's address. Detective Hunt, standing near the police vehicle, asked Defendant about the toys in the Ford Edge.

In response to additional questions from Detective Roseman about the owner of the Ford Edge, Defendant stated that his friend Tamara lived in Chicago and that her last name was Johnson. Defendant also indicated that Tamara worked as a bartender. Detective Roseman then informed Defendant that Defendant's license was good. Defendant again stated that he had to use the

bathroom.

    Detective Roseman testified that during his conversation with Defendant in the police vehicle, Defendant began exhibiting indicators of heightened stress—labored breathing, a visible neck pulse, and yawning. In order to determine whether these stress indicators were the result of a medical condition or merely Detective Roseman's questions, Detective Roseman asked Defendant whether Defendant was on medication and whether Defendant was physically able to drive. Defendant responded that he was not on medication and that he was able to drive.

    At approximately 2:07 p.m., during Detective Roseman's conversation with Defendant, Decatur Police Department Detective Chad Larner arrived at the scene of the traffic stop with Leeroy Jenkins, a canine trained in narcotics detection. Detective Larner testified at the evidentiary hearing that his assistance at the traffic stop had been requested by Detective Roseman and Detective Hunt. Detective Roseman requested Detective Larner's presence through an instant messaging program installed on the computers in the police vehicles operated by Detective Roseman and Detective Larner.

At approximately 2:08 p.m., about 10 minutes after initiating the traffic stop of the Ford Edge and before completing Defendant's written warning or using a window tint meter on the windows of the Ford Edge, Detective Roseman asked Defendant whether Defendant would consent to an officer walking a drug-sniffing dog around the Ford Edge. Detective Roseman informed Defendant that if the dog alerted to the vehicle, the officers would have probable cause to search the vehicle. In response to Detective Roseman's request for consent to the use of the drug-sniffing dog, Defendant told Detective Roseman four times that the officers could search the Ford Edge. In addition, Defendant, for the third time, stated that he had to use the bathroom and suggested that Detective Roseman walk him to the bathroom. Detective Roseman testified that throughout his conversation with Defendant in the police vehicle, Detective Roseman was writing Defendant's written warning, going through information that had been sent to the police vehicle's computer, or entering information into the computer to request additional information.

After Defendant had consented to a search of the Ford Edge, Detective Roseman continued to work on completing Defendant's

written warning.  Defendant Roseman again informed Defendant that the officers would use a window tint meter on the Ford Edge. Detective Roseman testified that the window tint meter, if available, is used to confirm that the windows are too dark and to confirm for the motorist that the traffic stop is justified.  Using the window tint meter also gives each window's light emittance, and obtaining that information is a part of the process of issuing a written warning for a window tint violation when a window tint meter is available.

    Although Defendant had given the officers consent to search the Ford Edge, Detective Roseman told Detective Larner that he still wanted Detective Larner to walk Leeroy Jenkins around the Ford Edge.  After leading Leeroy Jenkins to the Ford Edge, Detective Larner gave Leeroy Jenkins the command to sniff for illegal drug odors.  While walking around the Ford Edge, Leeroy Jenkins laid down and focused on the passenger side of the vehicle, actions that Detective Larner interpreted as Leeroy Jenkins alerting to the presence of illegal drug odor in the Ford Edge.

    Detective Roseman informed Defendant that the drug-sniffing dog had alerted to the Ford Edge.  Defendant denied the presence of drugs in the Ford Edge.  The officers searched the Ford Edge and

found approximately two kilograms of cocaine behind the vehicle's dashboard.

## II. ANALYSIS

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A traffic stop is considered a "seizure" for Fourth Amendment purposes. United States v. Whren, 517 U.S. 806, 809-810 (1996). Police may conduct a traffic stop if they have probable cause to believe the driver committed a traffic violation. Id. at 810.

Defendant does not dispute that Detective Roseman's stop of the Ford Edge was initially justified by multiple traffic violations committed by Defendant. However, Defendant argues that Detective Roseman violated the Constitution by impermissibly prolonging the traffic stop beyond the time reasonably required to issue Defendant a written warning for those violations.

An officer who reasonably initiates a traffic stop might violate the Constitution if he exceeds the scope of the stop or unreasonably prolongs it. United States v. Lewis, 920 F.3d 483, 491 (7th Cir. 2019). A traffic stop can become unlawful if it is prolonged beyond

the time reasonably required to issue a written warning.  Rodriguez v. United States, 575 U.S. 348, 354-55 (2015) (quoting Illinois v. Caballes, 543 U.S. 405, 406, 408 (2005)).  The officer may not prolong the seizure for inquiries "not fairly characterized as part of the officer's traffic mission" without reasonable suspicion to independently support the inquiry.  Id. at 356.  Even a slight increase in the detention of a vehicle, if unsupported by reasonable suspicion sufficient to justify a seizure, is unlawful.  United States v. Rodriguez-Escalera, 884 F.3d 661, 668 (7th Cir. 2018).

In addition to determining whether to issue a written warning and issuing the warning, an officer's mission during a traffic stop includes "ordinary inquiries incident to [the traffic] stop."  Rodriguez, 575 U.S. at 355.  Such inquiries, which include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance," serve the same objective as traffic code enforcement: "ensuring that vehicles on the road are operated safely and responsibly."  Id.

Even absent reasonable suspicion, a dog sniff of a vehicle's exterior for illegal drugs does not violate the Fourth Amendment if

conducted during a lawful traffic stop. Caballes, 543 U.S. at 410. However, if reasonable suspicion is absent, the critical question is whether the dog sniff added time to the stop, not whether the sniff occurred before or after the officer issued the written warning. Lewis, 920 F.3d at 491.

Defendant argues that his seizure became unreasonable when Detective Roseman had Defendant exit the Ford Edge and get into a police vehicle. Certainly, Detective Roseman could have issued Defendant a written warning for traffic violations without having Defendant sit in a police vehicle. But just because an act is not necessary to complete the mission of a traffic stop does not necessarily mean that the act impermissibly extends the stop or is not related to the traffic mission. Indeed, a police officer, during a valid traffic stop, may ask the driver to "step out of his car, even without any particularized suspicion" and "sit in [the officer's] patrol car." United States v. Baker, 78 F.3d 1241, 1244 (7th Cir. 1996); see also Pennsylvania v. Mimms, 434 U.S. 106, 111 (1977) (holding that the "legitimate and weighty" interest in officer safety justifies an officer's request, absent reasonable suspicion, that a lawfully stopped driver exit the vehicle). Detective Roseman did not

impermissibly prolong the traffic stop by having Defendant exit the Ford Edge and sit in a police vehicle.

Defendant also argues that Detective Roseman's actions while both men were in the police vehicle impermissibly prolonged the traffic stop. Defendant cites specifically to questions that Detective Roseman asked Defendant about the weather, the Ford Edge, Defendant's travel plans, Defendant's place of employment, Defendant's child, the mother of Defendant's child, and other topics unrelated to the reason for the traffic stop.

Detective Roseman did ask Defendant numerous questions during the traffic stop that were unrelated to Defendant's traffic violations. But that fact does not necessarily lead to the conclusion that the traffic stop became unlawful, as that conclusion follows only if the unrelated questions prolonged the traffic stop. See Arizona v. Johnson, 555 U.S. 323, 333 (2009) ("An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop.").

Defendant has not shown that Detective Roseman's questions

unrelated to the reasons for the traffic stop impermissibly extended the traffic stop. According to Detective Roseman's evidentiary hearing testimony, Detective Roseman, while conversing with Defendant in the police vehicle, was also (1) writing Defendant's written warning, (2) going through information sent to the police vehicle's computer, or (3) entering information into the computer to request additional information. Defendant has not shown otherwise. And the video of Defendant's traffic stop supports the Government's position that Detective Roseman diligently worked to complete the written warning as he conversed with Defendant.

Evidence submitted by Defendant after the evidentiary hearing shows that Detective Roseman also sent a single message to Detective Larner that appears to be a request for Detective Larner to come to the scene of the traffic stop. Even assuming that Detective Roseman's request for backup could serve as the basis for an impermissibly prolonged traffic stop, Defendant has not shown that the request impeded Detective Roseman's completion of the written warning in any measurable way.

At the time Detective Roseman asked Defendant for consent to have Leeroy Jenkins conduct a sniff of the Ford Edge, Detective

Roseman had not yet completed Defendant's written warning or used the window tint meter on the Ford Edge. Defendant has not shown that Detective Roseman's questions regarding topics unrelated to the reason for the traffic stop impermissibly prolonged Detective Roseman's issuance of the written warning. Accordingly, Defendant has not shown that his traffic stop became an unlawful seizure, and the evidence obtained from the search of the Ford Edge on May 16, 2018, need not be suppressed. See Lewis, 920 F.3d at 492.

One additional point merits a brief discussion. Defendant also argues that his consent to the search of the Ford Edge was not voluntary. However, this argument assumes that Defendant's traffic stop was impermissibly prolonged, which, as explained above, it was not. Therefore, Defendant's consent to the search of the Ford Edge was not vitiated on account of the length of the stop. The Court also rejects any argument that Defendant's consent was vitiated by the officers' refusal to let Defendant use the bathroom during the traffic stop. The video of the traffic stop establishes that Detective Roseman and the other officers conducted themselves in a professional manner and did nothing to intimidate Defendant into

consenting to a dog sniff of the Ford Edge.

### III. CONCLUSION

For the foregoing reasons, Defendant William A. Goodwill's Motion to Suppress (d/e 22) is DENIED.

ENTER: January 3, 2020

<i>/s/ Sue E. Myerscough</i>
SUE E. MYERSCOUGH
UNITED STATES DISTRICT JUDGE